kaw

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Case No. 08-40055-JAR** |
| | ) | |
| FELIPE J. PERALES, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM AND ORDER**

Defendant Felipe J. Perales is charged with possession with intent to distribute seven

pounds of methamphetamine in violation of 21 U.S.C. § 841(a)(1).  Before the Court are

defendant's Motion to Preserve Evidence (Doc. 9), Motion to Suppress (Doc. 14) and Motion to

Suppress Statements (Doc. 15).  On October 20, 2008, the Court heard testimony and received

evidence, after which the Court took the matters under advisement.  For the reasons detailed

below, defendant's motion to preserve evidence is granted and defendant's suppression motions

are denied.

**Background**

After reviewing the testimony and the videotape of the traffic stop, the Court finds the

following facts relevant to the determination of the issues before the Court.[1]

On June 4, 2008, at approximately 6:58 p.m., Kansas Highway Patrol Troopers Luka

---

[1]Defendant submitted reports detailing the wind speeds and wind gusts for that day; however, the area associated with the reports is the Manhattan Regional Airport, not the area where defendant was spotted drifting across the fog line.  As such, the report is of little relevance.  Defendant also submitted a transcript of the testimony of expert John Glennon.  Again, the transcript is of little aid, as Glennon focuses his analysis on the effect of wind gusts and wind speed on trucks, not small passenger vehicles like the Toyota Echo driven by Defendant.

Henderson and Andrew Dean were turning their patrol car around in the median to travel east on Interstate 70, when Trooper Henderson noticed a Toyota Echo traveling eastbound at about 65 miles per hour on a flat, straight section of Interstate 70.  Though it was nearly 7:00 p.m., it was still sunny, with clear skies.  Trooper Henderson observed that the Toyota Echo crossed over the "fog line," that is the line demarcating the right lane of traffic from the right shoulder.  The vehicle did not just barely cross over the fog line; rather about half of the width of the vehicle crossed over the fog line onto the shoulder.  The vehicle continued to travel in this position over the fog line for about  75 to 100 feet.  After returning to its lane, the vehicle noticeably continued to weave within the lane.  Trooper Henderson immediately wondered whether the driver had fallen asleep or was impaired in some manner; and Trooper Henderson thought that the vehicle was endangering the roadway.  Trooper Henderson turned on his emergency lights and pulled the vehicle to the side of the road for failure to maintain a single lane.

Trooper Henderson approached the vehicle on the passenger side and requested defendant's driver's license and insurance documentation.  Trooper Henderson explained that he did not intend to give defendant a citation; rather he wanted assurance that defendant was not impaired, as the Toyota drifted over the fog line "real quick."  While searching for his insurance papers and driver's license, defendant told Trooper Henderson that he had been stopped earlier that day by another officer.  Trooper Henderson asked defendant where he was traveling from and where he was heading.  Defendant stated that he was traveling from California and headed to Kansas City to meet a friend and obtain employment.  After receiving defendant's insurance and driver's license, Trooper Henderson returned to his patrol car and ran a driver's license and insurance check.  The check revealed that the Toyota was a salvaged vehicle owned by Rosa

Arellano, who was not present in the vehicle.  Trooper Henderson also noticed that the Toyota

had just been insured within the past month and had just been registered within the past six

months.  Based on his experience and training, Trooper Henderson knew that drug couriers

sometimes use salvaged vehicles for transportation of illegal narcotics.  After checking

defendant's driver's license, which listed defendant's name as Gonzalez Acosta, Trooper

Henderson returned to the Toyota and returned defendant's driver's license and insurance

document to defendant.

       After returning defendant's documents, Trooper Henderson asked defendant where

exactly in Kansas City he was going and defendant responded that he was going to the "center"

where he would call a friend to pick him up.  Trooper Henderson walked to the rear of the

Toyota before returning to ask defendant if he had any illegal drugs in the vehicle.  Defendant,

without difficulty communicating, stated that he did not.  Trooper Henderson then asked

defendant if he could search the vehicle, to which defendant responded "yes."

       When Trooper Henderson obtained permission to search the vehicle, Trooper Dean, who

stayed in the patrol car during the initial contacts with defendant, approached to help Trooper

Henderson search the vehicle.  Defendant exited the Toyota and was told to stand in front of the

vehicle while the officers searched it.  Defendant was wearing a baggy white shirt that did not

move in the wind when he stepped out of the vehicle.

       Trooper Dean approached the driver's side of the vehicle to begin his search.  He looked

at the steering panel and noticed that the dash and steering panel looked out of place.  Using his

pocket knife, Trooper Dean probed at the crack between the steering panel and the dash until the

steering panel fell, revealing gaps in the dash.  Trooper Dean shone his flashlight into the gaps

and noticed what he believed to be illegal contraband.  The items were subsequently removed and found to be methamphetamine.  Defendant was placed under arrest and read his *Miranda* rights.  On the way to Topeka, in the course of questioning the defendant, the troopers learned that defendant's real name was Felipe Perales and that he had an outstanding warrant in Oregon. The officers also learned that defendant was an illegal immigrant.

The troopers arrived in Topeka and met with Drug Enforcement Agent James Morgan in the Topeka Police Department parking lot.  Morgan read defendant his *Miranda* rights and asked him if he was willing to cooperate in a controlled delivery.  During the interview, Agent Stanchitis, who is fluent in Spanish, was available to interpret, but was not utilized because defendant did not have trouble understanding English.  Defendant was initially agreeable, but did not cooperate to the agents' satisfaction.  Defendant told Morgan that he was to call someone once he arrived in Kansas City, but did not give agents the name of the individual, although he provided a phone number for the individual, from memory.  Defendant told agents that he had the Toyota for two months and that he had borrowed it from a person whom he refused to identify.  After the interview, agents decided that defendant was not sufficiently cooperative to conduct a controlled delivery.

**Traffic Stop**

Defendant's first claim is that Troopers Henderson and Dean did not have reasonable suspicion to stop the Toyota.  Defendant claims that a quick drift over the fog line in windy conditions was not enough to give officers reasonable suspicion that defendant violated K.S.A. §

4

8-1522.[2]

"Stopping an automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the detention quite brief."[3]  The reasonableness of a stop is analyzed under *Terry v. Ohio*;[4] the test is whether the stop was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the stop in the first place.[5]  "[A] traffic stop 'is reasonable under the Fourth Amendment at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment

---

[2]  Section 8-1522 provides:
> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules in addition to all others consistent herewith shall apply.
> (a) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.
> (b) Upon a roadway which is divided into three (3) lanes and provides for two-way movement of traffic, a vehicle shall not be driven in the center lane except when overtaking and passing another vehicle traveling in the same direction when such center lane is clear of traffic within a safe distance, or in preparation for making a left turn or where such center lane is at the time allocated exclusively to traffic moving in the same direction that the vehicle is proceeding and such allocation is designated by official traffic-control devices.
> (c) Official traffic-control devices may be erected directing specified traffic to use a designated lane or designating those lanes to be used by traffic moving in a particular direction regardless of the center of the roadway and drivers of vehicles shall obey the directions of every such device.
> (d) Official traffic-control devices may be installed prohibiting the changing of lanes on sections of roadway and drivers of vehicles shall obey the directions of every such device.

[3]*United States v. Ochoa*, 4 F. Supp. 2d 1007, 1011 (D. Kan. 1998) (citing *United States v. Gregory*, 79 F.3d 973, 977 (10th Cir. 1996)).

[4]392 U.S. 1 (1968).

[5]*Ochoa*, 4 F. Supp. 2d at 1011.

regulations of the jurisdiction.'"[6]  Thus, the question before the Court is whether, under the circumstances, Troopers Henderson and Dean had probable cause to stop the Toyota or at the least, reasonable suspicion that defendant was impaired in some way.

The relevant Kansas statute provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."[7]  In *United States v. Gregory*,[8] the Tenth Circuit found that a single incident of drifting over the fog line did not give officers probable cause to stop a U-haul truck that was driving on Interstate 70.[9]  The Court reasoned that a single drift of two feet over the fog line was not a violation of Utah's traffic laws, for the windy weather and winding, mountainous road conditions made it difficult for the defendant to keep the vehicle and trailer within a single lane.[10]  But in *United States v. Ozbirn*,[11] the Tenth Circuit concluded that the officers had probable cause to stop defendant for violation of K.S.A. § 8-1522 when his motor home drifted over the shoulder twice in a quarter mile under optimal weather, road, and traffic conditions; or alternatively the officer "had, at a minimum, a sufficient reasonable, articulable suspicion warranting an investigative stop."

Here, defendant likens his case to *Gregory*, arguing that one instance of drifting over the

---

[6]*United States v. Ramstad*, 308 F.3d 1139, 144 (10th Cir. 2002) (citing *United States v. Ozbirn*, 189 F.3d 1194, 1197 (10th Cir. 1999) (quoting *United States v. Bostero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc))).

[7]K.S.A. § 8-1522(a).

[8]79 F.3d 973 (10th Cir. 1996).  The Utah statute similarly provides that a vehicle operate "as nearly as practicable entirely within a single lane."  Utah Code Ann. § 41-6a-710(1)(a)]

[9]*Id.* at 978.

[10]*Id.*

[11]189 F.3d 1194, 1198-1199 (10th Cir. 1999).

fog line is not enough under windy conditions.  The Court disagrees.  For one thing, there is no credible evidence that it was windy.  The officers testified that it was not windy; the videotape does not evidence cars, the troopers' or defendant's clothing nor any other items affected in any way by wind; and the weather reports offered by the defendant do not prove what the wind conditions were in the precise area where the traffic stop occurred.

Second, the defendant was driving a Toyota Echo, a substantially smaller and more controllable vehicle than a U-haul truck.  Third, the defendant was driving under the speed limit, thus making it easier for him to control his vehicle, and he was driving on a flat straight roadway.  Fourth, though the defendant's vehicle drifted over the fog line onto the shoulder for a relatively brief period of time, traveling about 75 to 100 feet, it was not a minor drift over the fog line.  This was not a situation where the vehicle's right wheels touched the fog line, or slightly veered over the fog line.  Rather, half the width of the vehicle was in the lane, and half the width of the vehicle was traveling on the shoulder.  Fifth, the vehicle continued to weave within the traffic lane after drifting across the fog line.  This suggested to Troopers Henderson and Dean that the driver was impaired in some manner.   Indeed, upon stopping the vehicle, Trooper Henderson told the defendant that he stopped him because of concern that he was impaired.

This case is more similar to *Ozbirn*, than it is to *Gregory*.  Like the defendant in *Ozbirn*, the defendant in this case was driving under optimal road conditions on a straight roadway.  Accordingly, Trooper Henderson had at least reasonable suspicion that defendant was impaired, if not probable cause that he had violated K.S.A. § 8-1522.[12]

---

[12]*See also United States v. Dunn*, 133 F.3d 933, No. 96-CR-40030, 1998 WL 8227, *2 (10th Cir. Jan. 12, 1998) (finding that one drift over the fog line in optimal circumstances could give probable cause to stop a vehicle).

**Duration of the Stop**

The next issue, though not briefed by the defendant, that arose during the suppression hearing is whether Trooper Henderson extended the detention of defendant beyond the scope of the purpose of stop. "As a general rule, once an officer's purpose in a traffic stop based on probable cause or reasonable suspicion is complete, the officer must let the person go."[13] However, "a traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose of the stop, provided that those questions do not unreasonably extend the amount of time that the subject is delayed."[14] During *Terry* stops, "[a]n investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification."[15] "An investigative detention may be permissibly expanded beyond the reason for its inception if the person stopped consents to that expansion [or if] . . . the detaining officer at the time of the detention has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"[16]

Here, Trooper Henderson's first questions were well within the purpose of the stop; he stopped the defendant out of reasonable suspicion that the defendant might be impaired. Trooper Henderson's initial discussion with the defendant was about the trooper's concern that the defendant might be impaired given that the vehicle had crossed the fog line. And Trooper

---

[13]*Ozbirn*, 189 F.3d at 1198.

[14]*United States v. Alcara-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006) (quoting *United States v. Martin*, 422 F.3d 597, 601-02 (7th Cir. 2005)).

[15]*United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

[16]*Id*. at 946 (citing *United States v. Lambert*, 46 F.3d 1064, 1069 (10th Cir. 1995)).

8

Henderson's questions about the defendant's travel itinerary were pertinent in ascertaining whether the defendant might be sleep deprived from long distance driving.

Moreover Trooper Henderson did not prolong defendant's detention after checking his documents.  In this instance, Trooper Henderson returned defendant's documents and walked nearly to the back of the Toyota before turning and walking back and asking defendant if he had any illegal contraband in the car.  Defendant said no and consented when Trooper Henderson asked if he could search the vehicle.  There is no evidence that defendant's consent was not given freely and voluntary.  Even if Trooper Henderson's questions prior to requesting permission to search exceeded the purpose and scope of the initial stop, the Court believes that Trooper Henderson had an objective basis for believing that criminal activity was afoot.  By the time Trooper Henderson asked if any weapons or drugs were in the car, he knew defendant's unusual travel plans were to drive to the center of Kansas City and await a friend.[17]  Trooper Henderson knew that defendant could not provide a phone number or address for his friend. Trooper Henderson knew that the vehicle defendant was driving had a salvage title and belonged to someone else.  Trooper Henderson also knew that the vehicle had been recently insured and that it was recently registered within the past six months.  Under the totality of these circumstances, Trooper Henderson had an objective basis for extending the stop regardless of defendant's consent.[18]  In any event, simply asking defendant if he had contraband before requesting permission to a search his vehicle did not unconstitutionally extend the stop beyond

---

[17]*See id.* (noting that unusual travel plans coupled with other factors could lead to reasonable suspicion).

[18]*See United States v. Santos*, 403 F.3d 1120, 1129 (10th Cir. 2005) (stating that implausible travel plans could lead to reasonable suspicion); *United States v. Kopp*, 45 F.3d 1450, 1453-54 (10th Cir. 1995) (providing that the officer had reasonable suspicion to detain motorist because the officer did not find travel plans plausible).

9

the Fourth Amendment's parameters.

*Miranda* **Warnings**

Next defendant argues that the Troopers violated his rights because his *Miranda* rights were read to him in English, and as a result, he did not knowingly and voluntarily waive his rights. The government asserts that defendant fully understood the English language.

"It is a bedrock principle that the waiver of one's Fifth Amendment privilege against self-incrimination must be made 'voluntarily, knowingly and intelligently.'"[19] "Whether this standard is met 'depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'"[20] It is the government's burden to prove a valid waiver by a preponderance of the evidence.[21] "A waiver is made knowingly and intelligently when made 'with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"[22] "'The purpose of the "knowing and voluntary" inquiry. . . is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced.'"[23] "In determining whether a waiver of rights was knowing and intelligent, we employ a totality of the circumstances approach."[24] "Factual issues such as the claimed inability to understand English, or whether Defendant understood her *Miranda* rights, are questions of

---

[19]*United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008) (quoting *United States v. Morris*, 287 F.3d 985, 988 (10th Cir. 2002)).

[20]*Id.* at 1257 (quoting *Maynard v. Boone*, 468 F.3d 665, 676 (10th Cir. 2006)).

[21]*Id.*

[22]*Id.* (quoting *Morris*, 287 F.3d at 988).

[23]*Id.* (quoting *Godinez v. Moran*, 509 U.S. 389, 401 (1993)).

[24]*Id.* at 1256-57 (citing *Colorado v. Spring*, 479 U.S. 564, 573 (1987)).

fact which underlie the legal question of whether Defendant's waiver of rights was knowing and voluntary."[25]

In this case, defendant's claimed inability to understand English is belied by the evidence and testimony.  First, Trooper Henderson testified that defendant fully understood English; in fact, defendant told Trooper Henderson his travel plans when he was first approached.  The videotape of the traffic stop corroborates Trooper Henderson's testimony. Defendant can be seen and heard responding to Trooper Henderson's questions.  Second, Agent Morgan testified that defendant had no trouble understanding and communicating in English, and if he did, Agent Stanchitis was standing by to assist.  Finally, Trooper Henderson read defendant his *Miranda* rights after he was arrested at the scene and Agent Morgan subsequently read defendant his *Miranda* rights before conducting his interview.  During both readings, defendant did not assert that he did not understand his rights or request that Troopers Henderson, Dean, or Agent Morgan provide an interpreter.  Based on these facts, the Court believes that defendant understood English and understood the *Miranda* warnings as read to him twice.

**Preservation of Evidence**

Defendant requests the Court order the government to preserve any tape recordings, radio transmissions, or telephone calls relating to his stop and arrest.  In addition, defendant requests that the Court order Troopers Henderson and Dean, as well as any other officers involved, to preserve any field notes relating to this case.  The government does not object to the request, but insists on reviewing the information prior to permitting the defendant to copy the materials.  Accordingly, the motion to preserve evidence is granted.

---

[25]*United States v. Castorena-Jaime*, 285 F.3d 916, 926 (10th Cir. 2002) (citing *Valdez v. Ward*, 219 F.3d 1222, 1231 (10th Cir. 2000)).

**IT IS THEREFORE ORDERED THAT** Defendant's Motion to Suppress (Doc. 14) and Motion to Suppress Statements (Doc. 15) are denied.  Defendant's Motion to Preserve Evidence (Doc. 9) is granted.

**IT IS SO ORDERED**.

Dated:  November 19, 2008

 S/ Julie A. Robinson_____
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE